UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Moises Adrian TAX TIU,<br><br>Petitioner,<br><br>v.<br><br>David WESLING, et al., | Case No. 1:26-cv-13462-NMG |

**MOTION TO ENFORCE JUDGMENT AND INCORPORATED MEMORANDUM**

Irene C. Freidel
Rhonda Tietjen
Julia Ciachurski
Political Asylum/Immigration Representation
(PAIR) Project
98 N. Washington Street, Suite 106
Boston, MA 02114
(617) 947-6349
ifreidel@pairproject.org

*Pro bono counsel for Petitioner*

Petitioner Moises Adrian Tax Tiu ("Petitioner" or "Mr. Tax Tiu") respectfully moves the Court to enforce its August 21, 2026 Order in this case requiring that Respondents provide Mr. Tax Tiu with "a bond hearing that comports with the requirements of due process." Memorandum and Order at 3 (ECF No. 12). Immigration Judge ("IJ") Julian Nierva of the Chelmsford Immigration Court conducted a bond hearing for Petitioner on August 28, 2026. However, the bond hearing did not comply with due process because (1) the IJ's decision reflects that, while recognizing the existence of the burdens as stated in *Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021), the IJ did not actually apply the burden as required; and (2) the evidence before the IJ "could not, as a matter of law, have supported' the IJ's decision to deny bond." *See Diaz Ortiz v. Smith*, 384 F. Supp. 3d 140, 143 (D. Mass. 2019). The grounds to support the Motion are set forth herein and in the accompanying exhibits to the Declaration of Irene C. Freidel ("Freidel Decl.").

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Petitioner Moises Tax Tiu is a 36-year-old indigenous man from Guatemala. Freidel Decl. at Ex. 1 (bond evidence), Tab B. He was born on September 9, 1989. *Id.* As a child and adult in Guatemala, Mr. Tax Tiu suffered continuous harm due to his indigenous identity. *Id.* He came to the United States for the first time when he was 17 years old and moved to Waltham, MA where he had a friend. *Id.* Mr. Tax Tiu, with no parental guide, enrolled himself in Waltham High School so that he could complete his education and learn to speak English. *Id.* He graduated from Waltham High in 2009. Ex. 1, Tab E (diploma). He is fluent in English. *Id.*, Tab B.

Mr. Tax Tiu has a US citizen daughter born in 2011. Ex. 1, Tab H & I. He left the United States to go to Portugal with his then wife, a Portuguese citizen, and his daughter because he could obtain legal status there. Ex. 1, Tab B. Things did not work out, and Mr. Tax Tiu had no

choice but to return to Guatemala. After his return to Guatemala, Mr. Tax Tiu started a successful business and had two additional children. Because of his indigenous identity and success as a business owner, Mr. Tax Tiu was targeted by organized crime. Ex. 1, Tab B. He was threatened and beaten. When Mr. Tax Tiu reported the harm to the police, the police notified the criminals, and Mr. Tax Tiu was further harmed and sexually assaulted. *Id.*

Believing his life was in danger, Mr. Tax Tiu returned to the United States in April 2024. Ex. 1, Tab B. He passed a credible fear interview after entering the U.S. based on the severe harm he suffered in Guatemala prior to his last departure, and he was released into the United States on parole on May 14, 2024. Ex. 1, Tabs B, D; DHS bond evidence attached as Exhibit 2 to Freidel Decl. Mr. Tax Tiu's parole expired on May 14, 2025. ECF No. 6-3. During the period of parole, Mr. Tax Tiu returned to Waltham, MA and hired counsel who helped him file a timely I-589, Application for Asylum and Withholding of Removal. Ex. 1, Tabs B & J; Ex. 2. In addition, he obtained lawful work authorization and worked multiple jobs to support his children. Ex. 1, Tabs C, F, L. Mr. Tax Tiu attended church two to three times a week and spent time each week with his daughter. Ex. 1, Tabs B, G, H. He expanded his ties within the community, church, and his family. Ex. 1, Tabs O-R (support letters from community and church members).

Mr. Tax Tiu has no criminal convictions. Exs.1 & 2. He has been charged with a single crime. The arrest took place at his home in Waltham on July 17, 2026 and the arraignment occurred at the Waltham District Court on July 20, 2026. Ex. 1, Tab B; Ex. 2. Mr. Tax Tiu was charged with Assault and Battery on a Family/Household Member, in this case, Mr. Tax Tiu's live-in girlfriend. Ex. 1, Tab B. Through his sworn testimony, Mr. Tax Tiu disputes the events that are described in the police report, *id.*, and the police report itself shows that Mr. Tax Tiu did not physically harm his girlfriend. Ex. 2. As he describes in his declaration, Mr. Tax Tiu and his

girlfriend got into an argument on a Friday evening. She wanted to go out in the car; he did not want her to go, because he was worried about her. She took his phone, which he was using as the remote control for the TV, which Mr. Tax Tiu was watching while enjoying some drinks on a Friday after work. They tussled over the phone and the keys, each trying to get the other. Mr. Tax Tiu had no intention of driving anywhere. He has never been charged with any other crimes, including operating under the influence; he would not drink and drive. Ex. 1, Tab B.

The Waltham Police arrested Mr. Tax Tiu who apologized to the police for inconveniencing them. Ex. 2 (police report). The police determined that it was not necessary to keep Mr. Tax Tiu in jail and, at approximately 4:30 a.m., they released him on his own recognizance with instructions not to return to his apartment or communicate with his girlfriend, and to appear for his arraignment at Waltham District Court on the morning of July 20, 2026. Ex. 2. Mr. Tax Tiu followed each of these instructions. He met his legal obligations and appeared at Waltham District Court on July 20, 2026 where he was arraigned, arrested by ICE, and placed in custody at the Plymouth County Correctional Facility in Plymouth, MA. Ex. 2.

On July 29, 2026, Mr. Tax Tiu filed a petition for a writ of habeas corpus with this Court to obtain a bond hearing. On August 21, 2026, the Court granted the Petition (ECF No. 12) and ordered Respondents to provide Mr. Tax Tiu with "a bond hearing that complies with the standards in Hernandez-Laura v. Lyons, 10 F.4th 19 (1st Cir. 2021) …." On August 28, 2026, IJ Nierva of the Chelmsford Immigration Court conducted a bond hearing. The IJ did not make a decision during the hearing nor ask any questions. Instead, later in the day, he issued a written decision denying bond finding that "DHS has met its burden of establishing that the Respondent poses a risk of flight by a preponderance of the evidence." Freidel Decl., Ex. 3 (bond decision) at 3. In reaching its decision, the IJ made several legal errors as discussed below. The evidence on

record could not, as a matter of law, support a finding that Mr. Tax Tiu is more likely than not going to flee rather than appear in Immigration Court to pursue his well-founded asylum application for which he has paid counsel. The IJ further erred by failing to consider alternatives to detention.

## II. SUBJECT MATTER JURISDICTION

The Court has jurisdiction to review this Motion. Respondents will argue that the Court lacks jurisdiction pursuant to 8 U.S.C. § 1226(e) to review the IJ's decision denying bond, because, the argument goes, Petitioner is asking the Court to reweigh evidence, which would be beyond the scope of the Court's jurisdiction. Respondents' anticipated argument is incorrect. The IJ's decision denying bond did not comply with due process, because it was based on a series of legal errors that resulted in a failure of the IJ to properly hold DHS to the standard that applies to flight risk determinations. Because Petitioner's challenge is directed at the legality and constitutionality of the IJ's decision, review is not barred by Section 1226(e).

A number of judges in the District Court have held that the Court may assess the constitutionality of an IJ's custody determination. *See, e.g., Reyes Vargas v. Warden, Plymouth County Correctional Facility*, C.A. No. 26-cv-11740-AK, 2026 WL 1453510 (D. Mass. May 22, 2026) (citing *Miti v. Moniz*, No. 26-cv-11327, 2026 WL 884639 at *1 (D. Mass. March 31, 2026) ("District courts retain habeas jurisdiction to ensure that immigration bond hearings are conducted within constitutional bounds"); *Does Reis v. Vitello*, No. 25-cv-10497, 2025 WL 1043434, at *2 (D. Mass. Apr. 8, 2025) ("[A] court may intervene where an immigration bail determination is *ultra vires* or facially unconstitutional"); *Massingue v. Streeter*, No. 19-cv-30159, 2020 WL 1866255, at *4 (D. Mass. Apr. 14, 2020) (district courts may consider whether an IJ's bond hearing was in compliance with constitutionally mandated standards); *Garcia v.*

*Hyde*, 817 F. Supp. 3d 112, 123-24 (D.R.I. Dec. 3, 2025) (district courts can assess constitutional adequacy of the bond hearing).

Here, Mr. Tax Tiu does not ask the Court to reweigh the evidence. As explained below, in denying bond, the IJ did not hold DHS to the proper standard for finding flight risk; the evidence as a whole and as a matter of law could not support the IJ's flight risk determination. As a result, the bond hearing did not comply with Mr. Tax Tiu's constitutional right to due process. Under these circumstances, the Court has subject matter jurisdiction to ascertain whether the IJ's bond hearing was constitutionally and legally adequate.

## III. THE COURT SHOULD EXERCISE ITS DISCRETION AND FIND THAT ADMINISTRATIVE REMEDIES NEED NOT BE EXHAUSTED

There is no statutory requirement for exhaustion here. Absent a statutory requirement, "sound judicial discretion governs" whether Mr. Tax Tiu should seek his remedy by appealing to the Board of Immigration Appeals ("BIA") before coming to this Court. *Morgan v. Garland*, 120 F.4th 913, 927 (1st Cir. 2024) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)).

The Supreme Court has stated that there are "three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion." *Portel-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 77 (1st Cir. 1997) (quoting *McCarthy*, 503 U.S. at 145-46). "These sets of circumstances are: first, where delay could cause irreparable harm to the litigant or undue prejudice to any subsequent judicial action; second, where substantial doubts exist as to the agency's institutional competence or power to grant meaningful redress; and third, where the 'administrative body is shown to be biased or has otherwise predetermined the issue.'" *Reyes-Vargas*, 2026 WL 1453510, at *4 (quoting *Gonzalez*, 109 F.3d at 77).

Each of the factors support a finding that the Court should exercise its discretion and find that no exhaustion requirement should be imposed on Petitioner. First, Mr. Tax Tiu's liberty

interests are at stake. "Loss of liberty is [certainly] a … severe form of irreparable injury." *Ferrera v . United States*, 370 F. Supp. 2d 351, 360 (D. Mass. 2005). The Court may excuse exhaustion to protect Mr. Tax Tiu's freedom. *Reyes-Vargas*, 2026 WL 1453510, at *4 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) ("[T]he interest in being free from physical detention by one's own government" is "the most elemental of liberty interests"); *Portela-Gonzalez*, 109 F.3d at 77 (citing *McCarthy*, 503 U.S. at 147)).

The timeline for administrative exhaustion is long and will further endanger Mr. Tax Tiu's liberty interests substantially. The Board of Immigration Appeals currently has a substantial case backlog rendering the timeline for any bond appeal to be lengthy. As noted in *Reyes Vargas*, "'[i]n 2024, the [Executive Office for Immigration Review] data showed an average processing time of 204 days for bond appeals' and that '200 bond appeal cases took a year or longer to resolve.'" 2026 WL 1453510, at *4 (quoting *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1248 (W.D. Wash. 2025). While undersigned counsel is not aware of current statistics on the timeline for bond appeals at the BIA, there is no reason to believe that it has shortened and, in fact, there is reason to believe it has become longer.[1] This timeline "is likely to further endanger Petitioner's liberty interests for months to years." *Reyes Vargas*, 2026 WL 1453510, at *4. Where bond is denied, as in Petitioner's case, his detention "continues until all proceedings and appeals are concluded … [and] lasts through the initial removal determination proceedings (which

---

[1] The BIA sits within the Department of Justice. In early 2025, the U.S. Attorney General shrank the panel of appellate judges at the BIA nearly in half from 26 seats to 15 seats. *See* Ximena Bustillo and Rahul Mukherjee, National Public Radio, *An immigration court few have heard of is quietly shaping policy behind the scenes* (March 2026), available at https://www.npr.org/2026/03/20/nx-s1-5707535/trump-immigration-detention-appeals-board-deportation. At the same time, the number of appeals pending with the BIA has jumped substantially from 138,589 at the end of FY 2024 to 282,434 as of the third quarter of 2026. *See* Executive Office for Immigration Review, *Adjudication Statistics, All Appeals Filed, Completed, and Pending* (July 24, 2026), available at https://www.justice.gov/eoir/media/1344811/dl?inline.

themselves can take months or years) and all inter-agency and federal court appeals, even where an individual has prevailed and the Government appeals." *Velasco Lopez v. Decker*, 978 F.3d 842, 852 (2d Cir. 2020); *see also Hernandez-Lara*, 10 F.4th at 29-30. "Allowing Petitioner's indefinite detention while this protracted administrative process unfolds, especially when the legality of Petitioner's detention is under challenge, would be a significant harm." *Reyes Vargas*, 2026 WL 1453510, at *4 (citing *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) ("[E]xhaustion might not be required if [the petitioner] were challenging her incarceration … or the ongoing deprivation of some other liberty interest.").

Further, the Board of Immigration Appeals – which, as noted, sits within the Executive Branch of our government -- is not a neutral adjudicatory body. Statistics show that in 2025, the BIA ruled in favor of the government in **<u>97%</u>** of publicly published BIA precedent decisions; as of March 18, 2026, the rate of government wins in such decisions was 90%. *See* Ximena Bustillo and Rahul Mukherjee, National Public Radio, *An immigration court few have heard of is quietly shaping policy behind the scenes* (March 2026).[2] Moreover, since 2025, the BIA has issued a number of decisions designed to restrict the availability of bond; for example, under BIA precedent – which has been successfully challenged in the First Circuit[3], among others -- the vast majority of individuals detained by ICE would be subject to <u>mandatory</u> detention. *See Matter of*

2 *See also*, Transactional Records Access Clearinghouse (TRAC), Syracuse University, *Asylum Denials Rise to 94% Amid the Remaking of the Immigration Court* (Aug. 31, 2026). Publicly available at https://tracreports.org/reports/779/ (last accessed Sept. 4, 2026).

3 *See Guerrero Orellana v. Moniz*, 2026 WL 2352042, *2, *11 --- F.4th ---- (Aug. 13, 2026) (rejecting *Matter of Yajure Hurtado* and finding that noncitizens "who are present in the United States without admission are not subject to § 1225(b)(2)(A)'s mandatory detention provision, but rather, are governed by § 1226" and noting that, as a result of the *Yajure Hurtado* decision, "the number of noncitizens held in detention increased. It was reported as of mid-January 2026 that the government's new mandatory detention policy had resulted in approximately 73,000 noncitizens being detained, "the highest level" of detention ever recorded. See Camilo Montoya-Galvez, ICE's Detainee Population Reaches New Record High of 73,000, as Crackdown Widens, CBS News (Jan.16, 2026), https://www.cbsnews.com/news/ices-detaineepopulation-record-high-of-73000/ [https://perma.cc/EY9JQZ27]."

*Yajure-Hurtado*, 29 I&N Dec. 216 (BIA 2025) (holding that a plain reading of INA § 235(b)(2)(A), IJs lack authority to hear bond requests or grant bond to noncitizens who are present in the United States without inspection and admission); *see also, e.g., Matter of Dobrotvorskii*, 29 I&N Dec. 211 (BIA 2025) (denying bond and addressing flight risk); *Matter of Akhmedov*, 29 I&N Dec. 166 (BIA 2025) (denying bond and addressing flight risk).

Finally, as noted, Petitioner is presenting a constitutional challenge to the manner in which the IJ misapplied the law in resolving his bond request. The "BIA regularly lacks authority to meaningfully adjudicate [constitutional claims] given its limited scope of review of the IJ's decision." 2026 WL 1453510, at *5 (citing *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 238 (W.D.N.Y. 2019) ("[T]he BIA does not have jurisdiction to adjudicate constitutional issues."). For all of these reasons, Mr. Tax Tiu's "individual interests 'weigh heavily against requiring administrative exhaustion' and outweigh countervailing institutional interests of 'protecting administrative agency authority and promoting judicial efficiency.'" *Reyes Vargas*, 2026 WL 1453510, at *4 (quoting *Miti*, 2026 WL 884639, at *5-6). Accordingly, Mr. Tax Tiu respectfully asks the Court to find that administrative exhaustion should not be required in his case.

## IV. STANDARD OF REVIEW

To review the IJ's custody determination for constitutional adequacy, the Court considers whether the IJ applied the correct legal standard. A petitioner may show the IJ's failure to apply the correct legal standard by either (1) "point[ing] to the language of the immigration judge's opinion" or (2) "demonstrat[ing] that 'the evidence itself could not – as a matter of law – have supported' the immigration judge's decision to deny bond.'" *Diaz Ortiz*, 384 F. Supp. 3d at 143 (quoting *Hechavarria*, 358 F. Supp. 3d at 240).

## V. ARGUMENT: MR. TAX TIU'S BOND HEARING WAS CONSTITUTIONALLY-DEFICIENT

At an immigration bond hearing in the First Circuit, DHS bears the burden of establishing that a noncitizen is either (1) dangerous by clear and convincing evidence or (2) a risk of flight by a preponderance of the evidence. *Hernandez-Lara*, 10 F.4th at 41. Here, the IJ denied bond based on flight risk, not on dangerousness. *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006), provides guidance as to the factors that an IJ may consider in determining whether a noncitizen poses a risk of flight for the purposes of the custody determination. In assessing the evidence, the IJ should be "reasonable." *Id.* An IJ may also "consider any evidence in the record … when assessing flight risk, provided that such evidence is 'probative and specific.'" *Garcia*, 817 F. Supp. 3d at 127 (quoting *Matter of Guerra*, I. & N. Dec. at 40-41).

The preponderance of the evidence standard for assessing flight risk requires the IJ to find that it is *more likely than not*, in other words, 51% or more likely, that the noncitizen will not appear at his Immigration Court proceedings. *See, e.g., United States v. 323 Quintales of Green Coffee Beans*, 21 F. Supp. 3d 122, 127–28 (D.P.R. 2013) ("The burden of showing something by a preponderance of the evidence" "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [it] may find in favor of the party who has the burden") (citing *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622 (1993). Here, the evidence was insufficient as a matter of law for the IJ to reasonably find that DHS had satisfied its burden of proving flight risk under the preponderance of evidence standard.

### A. <u>The IJ Did Not Hold DHS To Its Burden Of Proving Flight Risk By A Preponderance Of The Evidence</u>

Using a template, the IJ's bond order correctly recites that DHS has the burden of proving flight risk by a preponderance of the evidence pursuant to *Hernandez-Lara*, 10 F.4th at 41. Ex. 1 at 2. However, the IJ did not then hold DHS to that burden. The evidence, viewed as a whole and as a matter of law, could not support a finding that Mr. Tax Tiu is *more likely than not* going to fail to appear at his next Immigration Court hearing if released.

#### *1. DHS's evidence could not support a finding that Mr. Tax Tiu is more likely than not going to fail to appear in court*

The IJ cited several reasons why he concluded that Mr. Tax Tiu is a flight risk by a preponderance of the evidence. First, Mr. Tax Tiu "entered the United States unlawfully multiple times." Ex. 1 at 4. From there, the IJ concluded that Mr. Tax Tiu has exhibited "repeated disregard for the laws of the United States." *Id.* (quoting *Matter of C-M-M-,* 29 I&N Dec. 141, 143 (BIA 2025). In fact, Mr. Tax Tiu successfully entered the United States twice, first in 2007 when he was 17 years old (Ex. 1, Tab B) and again in April 2024. Ex. 2.[4] The vast majority of noncitizens who are eligible for bond entered the country without inspection; that fact does not render them flight risks. Otherwise, none would be granted bond.

Regardless, Mr. Tax Tiu's immigration history does not show that he is a flight risk here – it shows the opposite, that he wants to be here and not in Guatemala where he experienced severe harm sufficient to establish a credible fear of persecution and torture. Moreover, the evidence shows that Mr. Tax Tiu has taken steps to comply with the immigration laws after arriving in 2024: he hired attorneys who helped him timely apply for asylum to obtain lawful immigration status and legal work authorization. Ex. 1, Tabs B-C & J.

[4] Mr. Tax Tiu attempted to return to the United States in December 2020, but he was not successful. Ex. 2.

Next, the IJ said that Mr. Tax Tiu "gives inconsistent accounts of his immigration history …." Ex. 1 at 4. The IJ apparently reached this conclusion from an error in Mr. Tax Tiu's I-589, Application for Asylum, which was prepared by his counsel and can easily be remedied. The I-589, which DHS submitted into evidence (Ex. 2), erroneously states that Mr. Tax Tiu was in Peten, Guatemala from 1989 to 2024; however, it also says on the same page that he attended Waltham High School from 2006 to 2009. In the bond record, Mr. Tax Tiu submitted to the Court a copy of his high school diploma from Waltham High School, which was conferred upon him in 2009. Ex. 1, Tab E. Accordingly, there can be no dispute that Mr. Tax Tiu was in the United States in 2009 and he certainly was making no effort to hide as much from the Court. To the extent that his counsel made an error in the application, they can easily remedy it. It is a routine practice for noncitizens to update or correct their asylum applications before or at their merits hearings. *See, e.g.,* https://asylumist.com/2022/07/06/dont-forget-to-update-your-i-589/; https://resources.humanrightsfirst.org/i-589-amendments-filing/.

Interpreting the documents as showing "inconsistencies" and "frequent returns to his home country," the IJ concluded that Mr. Tax Tiu's "relief from removal" is "highly speculative." Ex. 1 at 4. This conclusion is, first, illogical and, second, incorrect. The evidence establishes that prior to his last departure from Guatemala, Mr. Tax Tiu experienced harm, including sexual assault that was sufficient for him to pass a credible fear interview at the border through which he "established a reasonable possibility of future torture if returned to Guatemala." Ex. 1, Tab D (summary of CFI). Mr. Tax Tiu hired private counsel to represent him in connection with his asylum/Convention Against Torture claim. Ex. 1, Tab J. The Department of Homeland Security ("DHS") through the USCIS Asylum Office conducted the credible fear interview and made the determination, knowing Mr. Tax Tiu's immigration history, that there is a credible, plausible

likelihood that Mr. Tax Tiu can establish an entitlement to fear-based relief in the Immigration Court (assuming the assigned IJ serves as a neutral adjudicator). The IJ's prejudgment and dismissal of Mr. Tax Tiu's asylum application flies in the face of DHS's own credible fear finding and thus cannot support a finding of flight risk.

Last, the IJ concluded that Mr. Tax Tiu's July 17, 2026 arrest supports a finding of flight risk, even though the IJ found that the same arrest did not support a finding of dangerousness. Ex. 1 at 1. The IJ's findings as to the arrest are legally flawed for two reasons. First, the IJ determined that the police report is "reliable and sufficiently corroborated." Ex. 1 at 4 (citing *Rosa v. Garland*, 114 F.4th 1, 10-11 (1st Cir. 2024). Second, the IJ concluded that the fact of the arrest "may affect [Mr. Tax Tiu's] availability for discretionary forms of relief, further making [his] relief highly speculative." Ex. 1 at 4.

As to the police report, there was no basis under First Circuit law for the IJ to conclude that the police report was reliable and to credit its statements as fact. The IJ cited *Rosa* without actually applying it. In *Rosa,* 114 F.4th at 17, the First Circuit stated that an IJ "may not give 'substantial weight' to a police report in the absence of 'a conviction or corroborating evidence of the allegations contained' in the report." Here, there is no conviction, and DHS offered no corroborating evidence regarding the allegations contained in the report. The IJ's conclusion to the contrary is simply erroneous.

*Arias-Minaya v. Holder*, 779, F.3d 54 (1st Cir. 2015) requires that, before relying on a police report that has not resulted in a conviction, an Immigration Judge must determine that a report is both reliable <u>and</u> that its use would not be fundamentally unfair. *Id.* at 54. *See also Rosa*. 114 F.4th at 9-12. As to reliability, the IJ must consider the police report and the evidence in the record and explain why they believe the report is reliable absent a conviction. As to whether use

of the police report is fundamentally unfair, the trier of fact must provide the noncitizen with "an opportunity to challenge its veracity and refute its contents." *Id.* at 12 (quoting *Arias-Minaya*, 779 F.3d at 54).

Here, as to reliability, the IJ did not explain why he found the report reliable or corroborated. Mr. Tax Tiu expressly challenged under oath the veracity of statements in the police report. *See* Ex. 1 at Tab B. It is not enough for the Court to conclude that the police report is reliable based on its internal statements when there is no external corroborating witness from whom DHS has obtained testimony or supporting evidence. The hearsay statements of the police officer or any witnesses contained within the police report do not constitute corroborating evidence. First Circuit case law establishes that a police report cannot be deemed or treated as *per se* reliable, because every police report is by its nature a summary of the police officer's observations and often contains hearsay statements from witnesses. Here, the police report provides speculative information, challenged under oath by Mr. Tax Tiu, and it cannot be relied upon to make factual findings against Mr. Tax Tiu as to whether he engaged in criminal conduct.

Reliance on the police report also would not satisfy the BIA's binding precedent in *Matter of Arreguin*, 21 I&N Dec. 38, 42 (BIA 1995), as discussed in *Rosa*, 114 F.4th at 16-23 and *Maurice v. Bondi*, 154 4th 15, 21 (1st Cir. 2025). As the First Circuit said in *Maurice*:

> *Arreguin* requires that to give [police] reports, 'substantial weight,' there must be 'corroborating evidence of the [report's] allegations.' *Rosa*, 114 F. 4th at 17 (quoting *Arreguin*, 21 I&N Dec. at 42).

*Id.* This requirement is separate from reliability and fundamental fairness findings. *Id.* at 22. The types of corroboration discussed in *Rosa*, *Maurice*, and *Arreguin* constitute evidence that is *external* to the police report. For example, in *Maurice*, the question was whether hearing testimony corroborated the police report. *Id.* In *Rosa,* the court stated that "[i]n every case where

we permitted reliance on a police report that did not culminate in a conviction to deny discretionary relief, the police report was accompanied by an admission of guilt, other corroborating evidence of guilt, and/or other negative factors that weighed against granting discretionary relief." 114 F.4th at 17 (citing *Thomas v. Garland*, 25 F.4th 50, 54 (1st Cir. 2022) (allowing reliance on police report where other negative factors were present); *Perez v. Barr*, 927 F.3d 17, 19 (1st Cir. 2019) (allowing reliance on police report where other negative factors included "lack of remorse" and prior felony convictions); *Lima v. Lynch*, 826 F.3d 606, 610 (1st Cir. 2016) (allowing reliance on police report where there were prior convictions); *Arias-Minaya*, 779 F.3d at 51 (allowing reliance on police report where petitioner did not deny facts alleged in police report).

Here, not only has Mr. Tax Tiu denied the charge against him and provided supporting testimony, Ex. 1 at Tab B, there are no negative factors that would justify a decision to give the police report substantial weight in the absence of DHS submitting any corroborating evidence to the Court. Regardless, nothing about the misdemeanor charge renders Mr. Tax Tiu a flight risk; he voluntarily attended his arraignment at the Waltham District Court on Monday, July 20, 2026, which is evidence that he will attend court when required to do so.

Moreover, the IJ's conclusion that the existence of the charge "may affect [Mr. Tax Tiu]'s availability for discretionary forms of relief, further making [Mr. Tax Tiu]'s relief highly speculative" is baseless. The police report on its face states that Mr. Tax Tiu's girlfriend was not physically harmed. Mr. Tax Tiu denies intending to drive anywhere, and he did not do so. Once cannot be convicted of a crime that did not occur. Finally, Mr. Tax Tiu is eligible for relief under the Convention Against Torture and statutory withholding of removal – both of which are *mandatory* (i.e., nondiscretionary) forms of relief. Even so, it would be an abuse of discretion,

under the BIA's own case law, to deny Mr. Tax Tiu protection based on an arrest that did not involve any violence or harm and did not result in a conviction. See, e.g, *Thamotar v. U.S. Att'y Gen.*, 1 F.4th 958, 971, n. 14 (11th Cir. 2021) (danger of persecution "outweigh[s] all but the most egregious of adverse factors."); *Matter of Kasinga*, 21 I&N Dec. 357, 367 (BIA 1996) (citing *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987)).

The IJ's finding, without further evidence or corroboration, is insufficient as a matter of law to support a finding of flight risk. The IJ should not be permitted to deny bond based on flight risk by reference to an unreliable police report when the same report was admittedly insufficient to support a finding of dangerousness. Based on the foregoing, the IJ's reference to Mr. Tax Tiu's immigration history, a single error in his I-589, and the existence of the criminal charge, which has not resulted in a conviction, are not sufficient as a matter of law to support a finding that Mr. Tax Tiu is a flight risk, let alone *by a preponderance of the evidence*. As a result, the IJ did not properly apply the burden of proving flight risk on DHS. The evidence produced by DHS does not, as a matter of law, support the flight risk finding. Further, it is neither "probative" nor "specific" as to the flight risk determination. *See Slander Mourao v. Moniz*, No. 26-cv-11443-AK (D. Mass. June 25, 2026) (ECF No. 22 at 7).

***2. The IJ failed to consider the evidence as a whole***

The evidence produced by Mr. Tax Tiu – when properly reviewed -- completely rebutted and overcame any suggestion by DHS that he is more likely than not going to fail to appear in Immigration Court when required to do so. The IJ simply paid lip service to some of Mr. Tax Tiu's evidence -- dismissing his undisputed "fixed address, work authorization and stable employment, letters of community support, and a United States citizen daughter" in a single sentence (*see* Ex. 1 at 4) -- and ignores the rest of it. In short, the IJ did not analyze or engage

with Mr. Tax Tiu's evidence as he was required to do. *See, e.g., Lopez Perez v. Wesling*, C.A. No. 26-cv-12268-IT, ECF No. 16 at 4 (D. Mass. Aug. 6, 2026) (granting motion to enforce where IJ failed to analyze the petitioner's evidence); *Martinez Aguilar v. McDonald*, C.A. No. 25-cv-13638-LTS (D. Mass. June 5, 2026) (ECF No. 17 at 2-3) ("adjudicating whether to detain or release another person is one of the more serious matters resolved by judges. It requires review and consideration of all relevant evidence submitted.") (emphasis in original); *I.G.S. v. Nessinger*, 25-cv-00339-MRD-PAS, ECF No. 24 at 5 (D.R.I. Sept. 12, 2025) ("[t]o seemingly disregard relevant details that speak [to] the heart of the matter – whether I.G.S. poses a flight risk – does not pay sufficient due to a just process"); *Mbiya v. Doe*, 26-cv-00467-JL-TSM, ECF No. 15 at 1-2 (D.N.H. July 21, 2026) (court granted relief "[b]ecause the evidence was insufficient as a matter of law to establish either dangerousness or a flight risk that no amount of bond or conditions of release could ameliorate").

Among other things, Mr. Tax Tiu submitted his own sworn testimony (Ex. 1, Tab B), a copy of proof of his lawful employment authorization valid until April 3, 2030 (Ex. 1, Tab C), an excerpt of his credible fear interview where he was found by DHS to have established a "reasonable possibility of future torture" if returned to Guatemala (Ex. 1, Tab D), a copy of his diploma from Waltham High School ((Ex. 1, Tab E), and a copy of his 2025 tax filing. Ex. 1, Tab F. He also filed a letter from his former mother-in-law and daughter's grandmother attesting to the fact that she has known Mr. Tax Tiu since 2006 and knows him to be a respectful, kind and caring person, as well as an "active and involved father." She is a US citizen and agreed to be Mr. Tax Tiu's sponsor, welcoming Mr. Tax Tiu into her home so he can live with her and his daughter if he is released from custody. Ex. 1, Tab G. In addition, Mr. Tax Tiu submitted a letter from his US citizen daughter along with photos of the two of them together (Ex. 1, Tabs H-I), a

letter from his paid immigration counsel who represent Mr. Tax Tiu on his asylum claim (Ex. 1, Tab J), a letter from Dunkin' Donuts confirming Mr. Tax Tiu's employment history (Ex. 1, Tab L), and letters of support from numerous supports and friends who know Mr. Tax Tiu through the community and his church, all of whom attest to his responsible nature. Ex. 1, Tabs M-R.

The IJ did not engage with any of this evidence. Crucially, the IJ also did not address the following pieces of evidence, which directly bear on flight risk, including that: (1) Mr. Tax Tiu is paying private lawyers to represent him in his Immigration Court proceedings so that he may pursue his asylum claim (Ex. 1 at Tab J); (2) Mr. Tax Tiu has a viable immigration application based on having passed a DHS-administered credible fear interview (Ex. 1 at Tab D); and (3) Mr. Tax Tiu voluntarily attended his court hearing at the Waltham District Court on Monday, July 20, 2026. Ex. 1, Tab B. These are not the characteristics of anyone who is more likely than not going to fail to appear in Immigration Court to pursue lawful immigration status.

The *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006), factors overwhelmingly support a finding that Mr. Tax Tiu is not a flight risk by the preponderance of the evidence. As a matter of law, the IJ failed to apply the required legal standard to Mr. Tax Tiu's bond evidence and thus deprived him of due process. *See Akinsanya v. Garland*, 125 F.4th 287, 297 (1st Cir. 2025) ("Merely stating the proper standard does not discharge the obligation to correctly apply" it).

**B. <u>The IJ Failed To Consider Alternatives To Detention, Which Are 98% Effective – Thus Neutralizing Any Flight Risk Concerns, According to ICE's Own Data</u>**

Assuming for the sake of argument that the evidence could support a conclusion that Mr. Tax Tiu is at least a 51% or more risk of flight, ICE's own evidence establishes that alternatives to detention, such as ankle monitors, are 98% effective in ensuring that noncitizens appear in Immigration Court when required to do so. As such, an alternative to detention ("ATD") would

neutralize any flight risk concerns, but the IJ did not address this issue despite clear evidence submitted to the Court showing their effectiveness.

Under BIA precedent, when an IJ finds an individual does not pose a danger, they should decide the amount of bond necessary to ensure the noncitizen's presence at future hearings and to ensure the noncitizen will report for removal if ordered to do so. *Matter of Urena*, 25 I&N Dec. 140 (BIA 2009). It is not sufficient for the court to find that no amount of bond or conditions can assure the respondent's presence at future Immigration Court hearings. Failure to consider alternative conditions of release in a bond determination is a violation of an individual's due process rights. *See Mijango-Velasco*, No. 26-11355-LTS, Doc. No. 19 at 5-6; *Costa,* No. 25-CV-13469-AK, 2026 WL 371198; *Brito v. Barr*, 415 F. Supp. 3d 258, 267-71 (D. Mass. 2019), aff'd in part, vacated in part, 22 F.4th 240 (1st Cir. 2021); *Reid v. Donelan,* 390 F. Supp. 3d 201, 225 (D. Mass. 2019); *see also Hernandez v. Sessions*, 872 F.3d 976, 990–91 (9th Cir. 2017) ("Is consideration of . . . possible alternative release conditions [] necessary to ensure that the conditions of their release will be reasonably related to the governmental interest in ensuring their appearance at future hearings? We conclude that the answer is yes.").

Courts recognize that alternatives to detention, such as GPS monitoring or check-ins, are proven to be highly effective in mitigating flight risk for noncitizens in immigration proceedings. *See, e.g., Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017) (recognizing that Intensive Supervision Appearance Program (ISAP) "resulted in a 99% attendance rate at all EOIR hearings and a 95% attendance rate at final hearings"); *see also Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 1233883, at *12 (E.D. Cal. Apr. 29, 2025). ICE's own evidence establishes that 98% of individuals on ATDs appear in the Immigration Court for their hearings. *See* Ex. 1, Tab S (stating data for first half of FY2026). ATDs, which includes GPS monitoring, phone check-ins,

and SmartLINK, are therefore extremely effective. Moreover, those alternatives are much cheaper to the American taxpayer than keeping an individual in detention. *See* Ex. 1, Tab T (ATDs cost $4.20 per day, while detention costs $152 per day).

The First Circuit and the Supreme Court have recognized, "'the choice . . . is not between imprisonment and the [noncitizen] 'living at large' in this country but 'between imprisonment and supervision under release conditions that may not be violated.'" *Hernandez-Lara*, 10 F.4th at 29, quoting *Zadvydas*, 533 U.S. at 696. *See also Hechavarria v. Whitaker* 358 F. Supp. 3d 227, 242 (W.D.N.Y. 2019) (holding bond hearing fell short of due process requirements where the IJ did not say "one word about any alternative to detention" over the course of the hearing); *see also Montesinos Olivar v. Wesling*, C.A. No. 26-cv-11102-ADB, ECF No. 14 (D. Mass. May 7, 2026)("the immigration judge's statement that 'no bond … [would] mitigate his risk of flight' [] does not reflect meaningful consideration of alternatives to detention"); *Vaca Espinoza v. Moniz*, No. 26-cv-11472-DJC, ECF No. 15 (D. Mass. June 17, 2026) (same); *Mijango Velasco v. Wesling*, No. 26-11355-LTS, Doc. No. 19 (D. Mass. April 24, 2026) at 5-6; *Costa v. McDonald*, No. 25-CV-13469-AK, 2026 WL 371198 (D. Mass. Feb. 10, 2026); *Brito*, 415 F. Supp. 3d 258, 267-71, *aff'd in part, vacated in part*, 22 F.4th 240 (1st Cir. 2021); *Reid v. Donelan,* 390 F. Supp. 3d 201, 225 (D. Mass. 2019).

Imposing continued civil detention, which may be prolonged during Mr. Tax Tiu's removal proceedings, while failing to consider less restrictive alternatives to detention, violates Mr. Tax Tiu's constitutional rights. Mr. Tax Tiu is currently detained at the Plymouth County Correctional Facility where he is subject to criminal conditions of confinement, despite never having been convicted of a crime. *See Hernandez-Lara*, 10 F.4th at 28, quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2nd Cir. 2020) ("[Petitioner] was not 'detained'; he was, in fact,

incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes.”). If a less restrictive alternative to detention is available, “due process requires the Government to at least address why those alternatives might be inadequate.” *Costa,* No. 25-CV-13469-AK, 2026 WL 371198 at *3. *See also Lopez Perez*, C.A. No. 26-cv-12268-IT, ECF No. 16 at 5 (an IJ’s “failure to meaningfully consider the factors relevant to a flight risk determination and the availability of any alternatives to detention render [the petitioner’s] bond hearing constitutionally inadequate.”) (citing *Slander Mourao*, No. 26-cv-11443-AK (ECF No. 22)). On this basis alone, the Motion should be granted.

## VI. CONCLUSION

For all the foregoing reasons, Respondent Moises Adrian Tax Tiu respectfully requests that the Court find that the Immigration Court conducted a constitutionally-deficient bond hearing and order Mr. Tax Tiu’s immediate release or such other relief that the Court deems just and appropriate.

Respectfully submitted,

MOISES TAX TIU

By his attorneys,

*/s/ Irene C. Freidel*
Irene C. Freidel
Rhonda Tietjen
Julia Ciachurski
PAIR Project
98 N. Washington Street, Suite 106
Boston, MA 02114
(617) 947-6349
ifreidel@pairproject.org

**LR 7.1 CERTIFICATE**

I, Irene C. Freidel, certify that I conferred with Respondents' counsel pursuant to Local Rule 7.1 prior to filing the foregoing Motion. Respondents' counsel stated that Respondents oppose this Motion.

*/s/ Irene C. Freidel*
Irene C. Freidel

**CERTIFICATE OF SERVICE**

I, Irene C. Freidel, certify that on this 8th day of September 2026, I caused a copy of the foregoing Motion and Incorporated Memorandum to be served on Respondents' counsel via the CM/ECF platform.

*/s/ Irene C. Freidel*
Irene C. Freidel